Patrick Connolly, as President of Local 824, Affiliated with the International Longshoremen's Association, et al., Respondents, *v.* James O'Malley, Jr., et al., Constituting the Waterfront Commission of New York Harbor, et al., Appellants.

First Department, December 6, 1962.

*Irving Malchman* of counsel (*William P. Sirignano*, attorney), for appellants.

*Henry A. Lowenberg* of counsel (*Maxwell N. Rudaw* with him on the brief), for respondents.

EAGER, J. The defendant Waterfront Commission of New York Harbor appeals from an order denying its motion for summary judgment dismissing the complaint upon the merits. The

complaint alleges several causes of action but involved here are only the first and second causes of action.[1]

The plaintiffs bring this action as the president and treasurer of Local 824 of the International Longshoremen's Association, which was and is a legally certified and recognized collective bargaining agent for the longshoremen on the piers of New York Harbor. The first cause of action on behalf of the association is framed to obtain a permanent injunction restraining the defendant commission from " ever permitting unlicensed, unregistered and non-union personnel to perform longshoreman work on the piers of New York Harbor ".

It is plaintiffs' position, according to their complaint, " That pursuant to the provisions of the Waterfront Commission Act [hereinafter referred to], no person is permitted to be employed upon the piers of New York Harbor as longshoremen, nor to carry or move cargo, materials or passengers' baggage, unless such person is theretofore registered and licensed by the defendant, Waterfront Commission of New York Harbor." Then, in the first cause of action, it is alleged that the defendant commission on six occasions between March 1, 1954 and November 25, 1960, unlawfully and arbitrarily permitted nonunion, unregistered and unlicensed personnel to perform services as longshoremen upon the piers; that such acts unlawfully interfered with employment contracts of the plaintiffs and their negotiations for labor contracts; that the acts did constitute strikebreaking and were calculated to and did prolong and extend labor disputes and strikes then pending during the occasions, resulting in damage to plaintiffs; that it is the intention of the defendants to again permit in the future, under similar circumstances, the employment of unlicensed, unregistered and nonunion personnel on the piers to perform longshoremen services; and that the same will constitute strikebreaking and will impair and prejudice the rights of the plaintiff association.

By the second cause of action, the plaintiffs seek the recovery of a declaratory judgment nullifying section 4.1 (subd. [b], par. [3]) of the Waterfront Commission Regulations, adopted April 19, 1960 (hereinafter set forth), which provides for the use, on its approval, of nonregistered personnel to move water-

---

[1] The third and fifth causes of action have been heretofore dismissed as against the defendant Waterfront Commission and no appeal has been taken from such dismissal. The said defendant is not involved in the fourth cause of action which purports to allege a cause of action for breach of a labor agreement between the plaintiff union and the defendant American Export Lines, Inc.; and such cause of action has been stayed pending arbitration.

borne freight where a special and emergency need exists for the protection of public health or safety.

The plaintiffs' said causes of action are based upon rights alleged to be possessed by them by virtue of the provisions of the Waterfront Commission Act which was enacted in 1953 (L. 1953, ch. 882) by the Legislatures of the States of New Jersey and New York pursuant to a Compact between them; and which was duly consented to by an Act of Congress of August 12, 1953 (67 U. S. Stat. 541). And, whether or not plaintiffs have a cause of action at all as against the commission depends upon the nature and extent of its powers under the act.

By article VIII of section 1 of said act, it is provided: "The commission shall establish a longshoremen's register in which shall be included all qualified longshoremen eligible, as hereinafter provided, for employment as such in the port of New York district. On or after the first day of December, nineteen hundred fifty-three, no person shall act as a longshoreman within the port of New York district unless at the time he is included in the longshoremen's register, and no person shall employ another to work as a longshoreman within the port of New York district unless at the time such other person is included in the longshoremen's register." (L. 1953, ch. 882, Part I, § 1, art. VIII, subd. 1, eff. June 30, 1953.)

Following the enactment of the act, with the provisions for the registration of longshoremen, it appears, without dispute, that there were occasions from time to time where, because of a strike or work stoppage, registered longshoremen were temporarily not available to move passengers and their baggage to and from ships which were embarking from or arriving in the port of New York. On these occasions, the steamship lines insisted upon using their employees for the purpose of moving the passengers and their baggage to and from the ships. The International Longshoremen's Association was equally insistent that only longshoremen registered with the commission could do such work and that, accordingly, the steamship lines were violating the Waterfront Commission Act. The steamship lines answered that no violations of the Waterfront Commission Act were involved in such circumstances. It appeared to the commission that, on such occasions, there were and would be times when there was a special or emergency need requiring action to protect the public health or safety. Thus, in order to deal affirmatively and definitely with these needs when they arose, the commission on April 19, 1960, pursuant to the authority of article IV of section 1 (subd. 7) (hereinafter referred to) of the

act, adopted paragraph (3) of subdivision (b) of section 4.1 of the regulations which reads as follows:

"Section 4.1 (b) Registration as a longshoreman is not required for

\* \* \*

"(3) persons who are regularly employed to perform labor or services not covered by subdivision (a) of this section [longshoremen's work] and who are assigned by such employer to the performance of labor or services covered by said subdivision (a) only to meet special or emergency needs for the protection of the public health or safety where approval therefor has been previously obtained from the Commission."

In connection with and as a part of its said regulation, the commission also adopted instructions providing that the application for approval by the commission of the use of nonregistered personnel during an emergency should be made in writing by the employer; and there was a specification of the matters to be certified therein by the employer.[2]

Upon the record here, it conclusively appears, without there being the semblance of an issue with regard thereto, that, on each of the particular occasions complained of by plaintiffs where

[2] "INSTRUCTIONS FOR AN APPLICATION FOR THE USE OF NON-REGISTERED PERSONNEL DURING AN EMERGENCY INVOLVING THE PUBLIC HEALTH OR SAFETY

"1. The Commission Regulations permit the use of non-registered personnel to move waterborne freight where a special or emergency need exists for the protection of the public health or safety and where approval is obtained from the Commission to use such personnel.

"2. In order to get such permission, the employer will have to make application in writing, in which he will certify as follows:

"1. That an emergency exists involving the protection of the public health or safety, setting forth the facts and details of such emergency for each ship.

"2. That only regular employees of his company will be used for this purpose.

"3. That no one will be used who has been denied registration or whose registration has been previously revoked by this Commission, or is under present suspension.

"4. That no one will be used who, to the best knowledge of the employer, has a criminal record.

"5. That the employer will maintain accurate records of the names of persons so used and their time and place of assignment.

"6. That such records will be available for inspection by Commission personnel at the direction of the Executive Director in the event such records become necessary for an investigation conducted by the Commission or other law enforcement agency.

"7. That anyone so used by the employer will be removed immediately at the request of the Executive Director."

nonregistered personnel allegedly performed services of longshoremen, there was in progress a strike or work stoppage by longshoremen pending a labor dispute; that the services complained of consisted of the moving by passenger ship employees of passengers' baggage either off the ship onto the pier or from the pier onto the ship in connection with the debarkation or embarkation of the passengers; that whenever this was done prior to April 19, 1960, it occurred without the authority of the commission; that, in fact, on an occasion of a strike or work stoppage in October, 1959, the commission instituted a suit to enjoin certain steamship lines from employing nonregistered personnel to remove passengers' baggage, but such suit became moot when the work stoppage ended.

In any event, it is undisputedly established that, at all times since April 19, 1960, actions of the commission in authorizing the moving of water-borne freight on the piers by nonregistered personnel has been limited to actions pursuant to the authority of its said regulation 4.1 (subd. [b], par. [3]). Furthermore, the threat of future actions on the part of the commission in this connection is confined to its claim of the right to proceed pursuant to the provisions of such regulation. Thus, the controlling question here, so far as both causes of action are concerned, is as to the validity of said regulation. If, as we conclude, the said regulation is in all respects a valid exercise of the powers of the Waterfront Commission, then, the first cause of action for an injunction and the second cause of action for a nullification of said regulation must be dismissed upon the merits.

The plaintiffs argue that the said regulation of the commission is invalid as not authorized by the act and beyond the powers of the commission. In support of the regulation, however, the commission points to subdivision 7 of article IV of section 1 of said act, which provides that " the commission shall have the power: * * * To make and enforce such rules and regulations as the commission may deem necessary to effectuate the purposes of this compact or to prevent the circumvention or evasion thereof ".

By the terms of the statute, there is expressly conferred upon the commission broad and discretionary rule-making powers to carry out the purposes of the act. This was clearly necessary. In the carrying out of its day-by-day responsibilities in the administration and enforcement of the provisions of the act, the commission was bound to be faced with varying and complex conditions requiring prompt action in the interest of public welfare, and this the enacting Legislatures well knew. They could

not " constitutionally [be] required to appraise beforehand the myriad situations to which [they might wish] a particular policy to be applied and to formulate specific rules for each situation." (*American Power Co.* v. *Securities & Exch. Comm.*, 329 U. S. 90, 105.) If not impossible, it was certainly difficult or impracticable, for the Legislatures to lay down in the statute a comprehensive rule to meet the problems and emergencies which would from time to time arise. Thus, a large measure of discretion was properly to be delegated to the administrative agency to establish rules and regulations to take care of such problems and emergencies. (*Matter of Marburg* v. *Cole,* 286 N. Y. 202, 212; *Matter of City of Utica* v. *Water Pollution Control Bd.,* 5 N Y 2d 164, 169; *Darweger* v. *Staats,* 267 N. Y. 290, 306.)

The plaintiffs do not contend that it was unlawful for the Legislatures to confer upon the commission a general authority to make rules or regulations limited only by the specification that they should be such as the commission " may deem necessary to effectuate the purposes of this compact or to prevent the circumvention or evasion thereof ". Indeed, they would not be successful in any such contention. (See *Matter of City of Utica* v. *Water Pollution Control Bd., supra*; *Matter of Marbury* v. *Cole, supra*; *Matter of Humphrey* v. *State Ins. Fund,* 298 N. Y. 327, 331; *People* v. *Malmud,* 4 A D 2d 86, 91; see, also, 1 N. Y. Jur., Administrative Law, §§ 53, 59; Schwartz, Administrative Law, 34 N. Y. U. L. Rev. 1375.) Acting under the general rule-making authority conferred upon it, the commission, in the exercise of its discretion, was subject only to the requirement, applicable to administrative discretion generally, that it act reasonably and in full conformity with law. (See 2 Am. Jur. 2d, Administrative Law, § 296; *International Ry. Co.* v. *Davidson,* 257 U. S. 506, 514; *Cherubino* v. *Meenan,* 253 N. Y. 462, 467; *People* v. *Malmud, supra.*)

Unquestionably, where the rules or regulations of an administrative agency are in conflict with the provisions of the statute or inconsistent with its design and purpose, they are to be held invalid. (See *Matter of Humphrey* v. *State Ins. Fund, supra*; also 1 N. Y. Jur., Administrative Law, § 104.) It is true that here the Waterfront Commission Act, requiring the registration of longshoremen, provides that no person shall act as a longshoreman or be employed to work as a longshoreman unless he is registered. (See § 1, art. VIII, subd. 1.) But there is no provision in the act effective or designed to take care of an emergency situation on a pier where the services of duly registered longshoremen are not available and cannot be obtained. And

clearly, the act did not contemplate a registration of longshore-men on a ship-by-ship or day-by-day basis to take care of an emergency. So, regulation 4.1 (subd. [b], par. [3]), adopted to implement the act to take care of an unprovided for contingency and to provide for a situation, where public health and safety is involved, is entirely compatible with the provisions and design of the act.

The plaintiffs point to the fact that there is the provision in the act that, '' [N]otwithstanding any other provision of this article [art. IX], the commission shall at any time have the power to register longshoremen on a temporary basis to meet special or emergency needs.'' (Part I, art. IX, subd. 5.) The preface of these provisions of said subdivision 5 by the phrase '' [N]otwithstanding any other provision of this article '' defi-nitely limits the effect thereof. It is to be noted that said article IX specifically deals with the powers and duties of the commis-sion to remove drifters and floaters as surplus longshoremen from the longshoremen's register and in effect to determine the size of the longshoremen's work force in the Port of New York. Thus, the undoubted purpose of subdivision 5 was to permit the commission to deal with a situation where, because of the regu-latory program provided for in this article or otherwise, the size of the available longshoremen's force may be too small for special or emergency needs, and thereby to empower the com-mission to register longshoremen on a temporary basis to meet such needs. But it is clear that the provisions of said subdivi-sion 5 were not intended to and are inapplicable to meet special or emergency conditions occurring on a day-by-day or ship-by-ship basis and arising not from the inadequacy of the size of the longshoremen's work force but from the total unavailability of such force to cope with such conditions. So, notwithstanding such provisions and independent thereof, one can readily see that, where longshoremen's help is not available to meet a par-ticular emergency suddenly arising and affecting the public health or safety, then some independent means of relief would be required. Regulation 4.1 (subd. [b], par. [3]), as furnishing such means, is not inconsistent with the provisions of said subdivision 5.

Considering the act as a whole, and bearing in mind the pur-poses thereof, the regulation may clearly stand as a fully con-sistent implementation of the act. It is completely in accord with the legislative purposes and tends to further the declared legislative policy. Briefly stated, the purposes of the act were to eliminate depressing and degrading labor conditions, corrupt

hiring practices and criminal activities on the New York water-front and to control and regulate in the public interest the occupations of longshoremen, stevedores, pier superintendents, hiring agents and port watchmen (see art. I of said act). Then, there is the express declaration that the regulation of such occupations "shall be deemed an exercise of the police power of the two states [New York and New Jersey] for the protection of the public safety, welfare, prosperity, health, peace and living conditions of the people of the two states." (Art. I, subd. 4.)

Clearly, in the administration and enforcement of the provisions of the act, paramount considerations are the public interest in established and orderly waterfront employment and the protection of the public health, safety and welfare of the people; and, by the terms of the law itself, the responsibilities in this connection are vested principally in the commission. (See part II.) In order to fully protect and promote the public interest and the public health, safety and welfare, a large measure of discretion naturally and necessarily accompanies the administrative, rule-making and enforcement powers of the commission. To hold otherwise would unjustifiably tend to restrict the application of this act, which, by virtue of its beneficient purposes, is to receive a most liberal construction and application. (See McKinney's Cons. Laws of N. Y., Book 1, Statutes, § 341; 82 C. J. S., Statutes, § 388.) So we have no difficulty in reaching the conclusion, that the commission was well within the bounds of its discretionary powers in laying down a rule, such as regulation 4.1 (subd. [b], par. [3]) to be followed as a matter of policy in emergency cases in furtherance of the aforesaid public interest and the sought for protection of public health and safety.

Concluding, therefore, as we do that, as a matter of law, regulation 4.1 (subd. [b], par. [3]) constitutes a reasonable and valid exercise of the rule-making powers of the commission, the record here does not disclose a triable issue of fact, the resolving of which in plaintiffs' favor would tend to sustain the first and second causes of action against the commission. There is no issue of fact raised in connection with plaintiffs' contention that there was not here a sufficient specification in the regulation of the standards and requirements to be complied with or followed as a basis for action by the commission under the regulation. As heretofore noted, the expressed primary standard of the existence of an emergency affecting the public health or safety was expressly supplemented by provisions for an application in writing by the employer in each case, with detailed requirements, including a showing, as to each ship, of the facts and details of

the emergency involving the public health or safety (see note 2, *supra*). So, we conclude that, as a matter of law, the regulation contains an adequate statement of safeguards. Where, as here, '' the administrative agency has adopted a standard as an interpretation of the broad powers granted to it by the statute, we may declare such a standard invalid only in the event that it is so lacking in reason for its promulgation that it is essentially arbitrary.'' (*Matter of Marburg* v. *Cole,* 286 N. Y. 202, 212, *supra*.)

There is no factual support whatever in the record for plaintiffs' allegations that acts of the commission were intended and carried out by defendants for the purpose of unlawfully intervening in labor disputes or strikes or that they constitute strike breaking, nor for the allegation that said regulation was designed and used as a strike-breaking device. The act was obviously not intended to further or protect the private interests of the union or, for that matter, of employers, during a labor dispute or strike. So, where the functions of the commission are exercised in good faith in the interests of public safety, health and welfare, then, neither the union nor the employers are legally aggrieved by any incidental effect thereof upon a labor dispute or strike. Actually, however, instead of the plaintiffs being aggrieved, the provisions of the act, as implemented by regulation 4.1 (subd. [b], par. [3]), tend to benefit plaintiffs' cause during a strike in that thereby such right as the employers might otherwise have to hire or use strike breakers is greatly limited.

There is here no showing of a factual basis for any claim of interference with any of the rights of the plaintiffs, and, it not appearing that the commission intends to proceed otherwise than as authorized by its said regulation, here determined to be valid, there is no threat of future illegal action entitling them to an injunction against the commission.

The order denying the motion for summary judgment should be reversed upon the law, with costs, and the defendants' motion should be granted and complaint dismissed as against the defendant Waterfront Commission of New York Harbor, with $10 motion costs.

BREITEL, J. P., RABIN, STEVENS and STEUER, JJ., concur.

Order, entered on December 26, 1961, unanimously reversed, upon the law, with $20 costs and disbursements to the appellants, defendants' motion for summary judgment granted, with $10 costs and the complaint dismissed as against the defendant Waterfront Commission of New York Harbor.